[Crim. No. 12872. In Bank. Sept. 24, 1969.]

THE PEOPLE, Plaintiff and Respondent, v. ROBERT EDWARDS et al., Defendants and Appellants.

 

 █

Howard E. Beckler for Defendants and Appellants.

A. Wallace Tashima as Amicus Curiae on behalf of Defendants and Appellants.

Thomas C. Lynch, Attorney General, William E. James, Assistant Attorney General, and Thomas Kallay, Deputy Attorney General, for Plaintiff and Respondent.

BURKE, J.—An information was filed charging Robert and Jennifer Edwards with violating Health and Safety Code sections 11530.5 (possession of marijuana for sale) and 11911 (possession of a restricted dangerous drug for sale). A jury trial was waived, and the case was submitted on the preliminary hearing transcript. The court found defendants guilty on each count. They appeal contending, among other things, that the trial court erred in admitting, over objection, evidence of marijuana found in a search of their trash can. We have concluded that the contention is meritorious and that the judgment must be reversed.

The sole witness at the preliminary hearing was Detective Bernie Hern of the Riverside County sheriff's office, who testified as follows:

Shortly after 9 p.m. on January 13, 1967, Hern contacted Mr. Hansen, who lived next door to defendants, and Hansen reported that about a week before he had seen on defendants' back porch a large plastic bag containing described packages, one of which was torn and contained a dark green vegetable substance that appeared similar to alfalfa but did not smell like alfalfa and had a "small funny type seed."

After discussing this information with other officers, Hern, accompanied by Detective Oden, walked down the railroad tracks behind defendants' residence and entered into "the open back yard area" of that residence. There the officers

observed three trash cans 2 or 3 feet from the back porch door. The officers did not have a search warrant. Inside one of the trash cans they found, among other things, a bag which contained marijuana—"possibly enough to roll a couple of cigarettes or more" and which had "Other stuff" on top of it."

Hern took the marijuana back to his office to examine it more carefully. He and other officers then returned to the area of defendants' house where they conducted a "stake out" from 12:30 a.m. until 4:40 a.m. when Hern, who was driving in his car, saw a vehicle that had been described as belonging to Mr. Edwards pull into the front yard of the house. Hern returned to the other officers and discussed approaching the residence.

Two officers then went to the rear door, and Hern, accompanied by several officers, went to the front door. Hern knocked, and a male voice from the upstairs asked "Who is it?" Hern replied, "Come on down. I want to talk to you." Defendant Robert Edwards crossed the dining room, approached the front door, and asked "What do you want?" Hern identified himself and stated in a loud voice "Open the door. I want to talk to you." Through the glass portion of the door Hern saw Robert Edwards "hurriedly proceeding" from the living room toward the dining room. The officers then forced open the door and arrested him in the dining room. Two officers were sent upstairs to "contact Mrs. Edwards and bring her down," and she came down moments later accompanied by the officers. Hern advised them that they were under arrest for "possession of marijuana, as to the possession of marijuana found in the trash receptacle. . . ." He asked, but was not given, permission to search the house. The officers nevertheless conducted a search of the house and in an "upstairs closet" found marijuana inside a duffel bag and L.S.D. and marijuana inside a suitcase. They also discovered marijuana in a sifter in the dining room, L.S.D. in the living room, and marijuana in a can on a bathroom shelf. Robert Edwards led the officers to a hole under the house, where additional marijuana was found, and particles (apparently of marijuana) were found in Edwards' vehicle. The officers did not have an arrest or search warrant.

Since the search of the trash can was without a warrant the burden was on the prosecution to show proper justification. (*People* v. *Kanos*, 70 Cal.2d 381, 384 [74 Cal.Rptr. 902, 450 P.2d 278]; *People* v. *Lara*, 67 Cal.2d 365, 373 [62 Cal.

Rptr. 586, 432 P.2d 202] ; *People* v. *Henry,* 65 Cal.2d 842, 845 [56 Cal.Rptr. 485, 423 P.2d 557].) The Attorney General argues that the search was valid because, he asserts, the premises around a house are not protected by the Fourth Amendment of the United States Constitution,[1] made applicable to the states by the Fourteenth Amendment (*Mapp* v. *Ohio,* 367 U.S. 643, 655-657 [6 L.Ed.2d 1081, 1090-1091, 81 S.Ct. 1684, 84 A.L.R.2d 933]), or article I, section 19, of the California Constitution, which contains an essentially identical guarantee of personal privacy.

As hereafter discussed, a number of cases involving claims of unconstitutional searches or seizures in open fields or grounds around a house have stated their conclusions in terms of whether the place was a "constitutionally protected area." That phrase, however, does not serve as a solution in all cases involving such claims, and we believe that an appropriate test is whether the person has exhibited a reasonable expectation of privacy, and, if so, whether that expectation has been violated by unreasonable governmental intrusion. Measured by that test, as we shall see, the search of the trash can was unlawful under the circumstances here appearing.

In *Hester* v. *United States,* 265 U.S. 57, 58-59 [68 L.Ed. 898, 899-900, 44 S.Ct. 445], the United States Supreme Court enunciated the "open fields" doctrine. There officers concealed themselves from 50 to 100 yards from the house of Hester's father and saw Hester leave the house and hand a bottle to one Henderson. When an alarm sounded, Hester and Henderson ran. Hester dropped a jug which broke, and Henderson threw away the bottle. The officers retrieved the jug and bottle, as well as a broken jar that was thrown from the house, and recognized their contents as moonshine. The opinion states, "It is obvious that even if there had been a trespass, the [officers'] testimony was not obtained by an illegal search or seizure. The defendant's own acts, and those of his associates, disclosed the jug, the jar and the bottle—and there was no seizure in the sense of the law when the officers examined the contents of each after it had been abandoned. . . . The only shadow of a ground for bringing up the case is drawn from the hypothesis that the examination of the vessels took place upon Hester's father's land. As to that, it is enough to say that, apart from the justification, *the special*

---

[1]The Fourth Amendment provides, "The right of the people to be secure in their persons, houses, papers, and effects against unreasonable searches and seizures, shall not be violated. . . ."

*protection accorded by the Fourth Amendment to the people in their 'persons, houses, papers, and effects,' is not extended to the open fields.* The distinction between the latter and the house is as old as the common law." (Italics added.)

The "open fields" doctrine of *Hester* v. *United States, supra,* 265 U.S. 57, has been applied by many lower federal court decisions in upholding the legality of a search or seizure. (E.g., *McDowell* v. *United States* (8th Cir.) 383 F.2d 599, 603 [items seized in fields separated from the defendant's farm buildings and about one-fourth to one-half a mile distant therefrom]; *Care* v. *United States* (10th Cir.) 231 F.2d 22, 25 [search of cave used as a distillery in a field across a road and more than a block from the defendant's home]; *Koth* v. *United States* (9th Cir.) 16 F.2d 59, 61 [search upon open premises apparently about a quarter of a mile from the house].)

The decisions of the lower federal courts, however, contain conflicting statements as to whether the *ground* area of the curtilage[2] is protected by the Fourth Amendment (see Davis, Federal Searches and Seizures (1964) pp. 14-15). Some, relying on *Hester* v. *United States, supra,* 265 U.S. 57, have declared that the "grounds" or "enclosed or unenclosed . . . grounds or open fields around . . . houses are not included in the prohibition of the Fourth Amendment." (*Monnette* v. *United States* (5th Cir.) 299 F.2d 847, 850; *Martin* v. *United States* (5th Cir.) 155 F.2d 503, 505; see *United States* v. *Hayden,* 140 F.Supp. 429, 435; 79 C.J.S., Searches and Seizures, § 13, pp. 790-791.) Under the foregoing rule it was held that the Fourth Amendment was not violated by the examination of a jug left on the ground under a car apparently parked by the porch of a shack belonging to one of the defendants (*Martin* v. *United States, supra*) or by the detection of an odor by the porch of the defendant's premises (*Monnette* v. *United States, supra*).

[2] It has been stated that "Whether the place searched is within the curtilage is to be determined from the facts, including its proximity or annexation to the dwelling, its inclusion within the general enclosure surrounding the dwelling, and its use and enjoyment as an adjunct to the domestic economy of the family." (*McDowell* v. *United States, supra,* 383 F.2d 599, 603; *Care* v. *United States, supra,* 231 F.2d 22, 25.) "The word originally signified the land with the castles and outhouses, inclosed often with high stone walls, and where the old barons sometimes held their court in the open air." (See 25 C.J.S., Curtilage, p. 82; Davis, Federal Searches and Seizures (1964) p. 11.) The presence of a fence or other boundary has been said to be an important, but not controlling, factor in determining the extent of the curtilage. (See Davis, *op. cit. supra,* p. 12.)

Other lower federal courts, however, have declared that "The protection afforded by the Fourth Amendment, insofar as houses are concerned, has never been restricted to the interior of the house, but has extended to open areas immediately adjacent thereto." (E.g., *Wattenburg* v. *United States* (9th Cir.) 388 F.2d 853, 857; see *Rosencranz* v. *United States* (1st Cir.) 356 F.2d 310, 313.) *Wattenburg, supra,* stated (at p. 857), "The differentiation between an immediately adjacent protected area and an unprotected open field has usually been analyzed as a problem of determining the extent of the 'curtilage,'" and *Wattenburg* held that a stockpile of trees in the backyard of a motel, not more than 35 feet therefrom, was within the curtilage of the abode of Wattenburg, who resided at the motel, and therefore protected by the Fourth Amendment.

Several California decisions, in rejecting claims of unlawful searches and seizures, have stated that "the premises around a house" or "'enclosed or unenclosed grounds or open fields' around a house" are not protected by the Fourth Amendment. (E.g., *People* v. *Shields,* 232 Cal.App.2d 716, 719 [43 Cal.Rptr. 188] [evidence found in fenced rear yard, used as auto wrecking yard, on premises where the defendant's house was located]; *People* v. *Jackson,* 198 Cal.App.2d 698, 701-702 [18 Cal.Rptr. 214] [bag containing marijuana found among garbage in trash pile on far side of chicken coop behind the defendant's house; according to officer, the trash pile appeared to be a "joint" one apparently of the defendant and his neighbor; the defendant testified that his neighbor alone used the trash pile].) *Shields* and *Jackson* relied in part on cases such as *Hester* v. *United States, supra,* 265 U.S. 57, and *Martin* v. *United States, supra,* 155 F.2d 503.

Other California cases have emphasized the degree of privacy the defendant enjoyed in the place in question. In *People* v. *Willard,* 238 Cal.App.2d 292 [47 Cal.Rptr. 734], an officer entered the side yard of a duplex through an open gate. A sidewalk went from the gate to a side porch that was unroofed; there were no bushes or hedges nearby. The officer stood on the first step of the side porch and looked through a window into the interior of the house where he observed certain matters. *Willard* concluded that under the circumstances there appearing the officer's acts did not constitute an unconstitutional invasion of the defendant's privacy. *Willard* stated (at p. 302) that under cited authorities looking through a window does not become an unreasonable search

merely because a police officer may be on the defendant's premises when he makes the observation and (at p. 307) that "the degree of privacy which defendant enjoyed in the place involved is an important factor in determining the reasonableness of the search. . . ."

The quoted statement in *People* v. *Willard, supra,* 238 Cal. App.2d 292, 307, was relied on by *People* v. *Alexander,* 253 Cal.App.2d 691 [61 Cal.Rptr. 814], which held that the Fourth Amendment was not violated by "the search" of the chimney of a barbecue, which was in the backyard of a single-family residence.

The United States Supreme Court has repeatedly recognized that "the security of one's privacy against arbitrary intrusion by the police" is "at the core of the Fourth Amendment." (E.g., *Berger* v. *New York,* 388 U.S. 41, 53 [18 L.Ed.2d 1040, 1049, 87 S.Ct. 1873]; *Schmerber* v. *California,* 384 U.S. 757, 767 [16 L.Ed.2d 908, 917, 86 S.Ct. 1826]; *Wolf* v. *Colorado,* 338 U.S. 25, 27 [93 L.Ed. 1782, 1785, 69 S.Ct. 1359] [overruled on another point in *Mapp* v. *Ohio, supra,* 367 U.S. 643].) In *Terry* v. *Ohio,* 392 U.S. 1, 9 [20 L.Ed.2d 889, 899, 88 S.Ct. 1868], the court stated, "We have recently held that 'the Fourth Amendment protects people not places,' (*Katz* v. *United States,* 389 U.S. 347, 351 [19 L.Ed.2d 576, 582, 88 S.Ct. 507] (1967) and wherever an individual may harbor a reasonable 'expectation of privacy,' *id.,* at p. 361 [19 L.Ed.2d at p. 588] (MR. JUSTICE HARLAN, concurring), he is entitled to be free from unreasonable governmental intrusion. . . ."

In *Katz* v. *United States, supra,* 389 U.S. 347, federal agents, by means of an electronic device listened to, and recorded, the defendant's end of a conversation made from a public telephone booth, the door to which apparently had been closed by the defendant. The court held (at p. 353 [19 L.Ed.2d at p. 583]) that "The Government's activities in electronically listening to and recording the petitioner's words violated the privacy upon which he justifiably relied while using the telephone booth and thus constituted a 'search and seizure' within the meaning of the Fourth Amendment" and that in the absence of prior judicial authorization the search and seizure were unreasonable. The court also noted (389 U.S. at p. 351, fn. 9 [19 L.Ed.2d at p. 581]) that although it had occasionally described its conclusions in terms of "constitutionally protected areas," it had "never sug-

gested that this concept can serve as a talismanic solution to every Fourth Amendment problem.''[3]

Recently we held in *People* v. *Terry*, 70 Cal.2d 410, 427-428 [75 Cal.Rptr. 199, 450 P.2d 591], that the defendant's constitutionally protected right of privacy was not violated when officers entered an apartment house garage, used in common by tenants of the apartment building, and saw in plain sight marijuana on an open ashtray inside the defendant's car. We pointed out that the Fourth Amendment prohibits unreasonable searches and seizures, not trespasses, and that, even if the officers' entry into the garage was a technical trespass, there was no violation of the Fourth Amendment.

In the light of the above authorities, we are satisfied that the search of the trash can was unlawful. As we have seen, the trash can was within a few feet of the back door of defendants' home and required trespass for its inspection. It was an adjunct to the domestic economy. (See *Work* v. *United States*, 243 F.2d 660, 662 [100 App.D.C. 237].) Placing the marijuana in the trash can, so situated and used, was not an abandonment unless as to persons authorized to remove the receptacle's contents, such as trashmen. (See *Work* v. *United States, supra*, at pp. 662-663.) The marijuana itself was not visible without ''rummaging'' in the receptacle. So far as appears defendants alone resided at the house. In the light of the combined facts and circumstances it appears that defendants exhibited an expectation of privacy, and we believe that expectation was reasonable under the circumstances of the case. We can readily ascribe many reasons why residents would not want their castaway clothing, letters, medicine bottles or other telltale refuse and trash to be examined by neighbors or others, at least not until the trash had lost its identity and meaning by becoming part of a large conglomeration of trash elsewhere. Half truths leading to rumor and gossip may readily flow from an attempt to ''read'' the contents of another's trash.

It is also clear that defendants' reasonable expectation of privacy was violated by unreasonable governmental intrusion. The United States Supreme Court repeatedly ''has empha-

---

[3]*Desist* v. *United States*, 394 U.S. 244, 254 [22 L.Ed.2d 248, 258, 89 S.Ct. 1030, 1048], held that ''*Katz* is to be applied only to cases in which the prosecution seeks to introduce the fruits of electronic surveillance conducted after December 18, 1967.'' However, the rule that had emerged from decisions before *Katz* and that was applied there in the context of electronic surveillance, of course, remains applicable in other contexts irrespective of the date of the events in question.

sized that the mandate of the [Fourth] Amendment requires adherence to judicial processes [citation], and that searches conducted outside the judicial process, without prior approval by judge or magistrate, are per se unreasonable under the Fourth Amendment . . . —subject only to a few specifically established and well-delineated exceptions." (*Katz* v. *United States, supra,* 389 U.S. 347, 357 [19 L.Ed.2d 576, 585, 88 S.Ct. 507].) In the instant case it does not appear that any of the exceptions apply to the search of the trash can. Accordingly, that search was unlawful under the Fourth Amendment of the federal Constitution. It similarly violated article I, section 19, of the California Constitution. The trial court thus erred in admitting the evidence found in the trash can.

*People* v. *Bly,* 191 Cal.App.2d 352, 354 [12 Cal.Rptr. 542], is disapproved to the extent that it is inconsistent with the views expressed herein.

■ Should the marijuana and L.S.D. found on the premises and in the vehicle following the arrests also have been excluded as the "fruit" of the prior illegal search?[4]

■ The exclusionary prohibition, of course, extends to the indirect as well as the direct products of an illegal search. (*Wong Sun* v. *United States,* 371 U.S. 471, 484 [9 L.Ed.2d 441, 453, 83 S.Ct. 407]; *Silverthorne Lbr. Co.* v. *United States,* 251 U.S. 385 [64 L.Ed. 319, 40 S.Ct. 182, 24 A.L.R. 1426].) ■ The test for determining the reach of the "fruits" doctrine is that set forth in *Wong Sun* v. *United States, supra,* at pages 487-488 [9 L.Ed.2d at p. 455, 83 S.Ct. 407], wherein the court stated, "We need not hold that all evidence is 'fruit of the poisonous tree' simply because it would not have come to light but for the illegal actions of the police. Rather, the more apt question in such a case is 'whether granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint.' Maguire, Evidence of Guilt, 221. . . ." (See also *United States* v. *Wade,* 388 U.S. 218, 241 [18 L.Ed.2d 1149, 1165, 87 S.Ct. 1926]; *People* v. *Terry,* 70 Cal.2d 410, 427-428 [75 Cal.Rptr. 199, 450 P.2d 591]; *People* v. *Kanos, supra,* 70 Cal.2d 381, 385-386; *People* v. *Bilderbach,* 62 Cal.2d 757, 766 [44 Cal.Rptr. 313, 401 P.2d 921]; Robert Pitner, *Fruit of the Poisonous Tree,* 56 Cal.L.Rev. 579, 588 et seq.)

---

[4]An objection based on "the fruits of the poisonous tree" doctrine was made in the trial court.

██ Here, independent of the evidence found in the search of the trash can, the officers had the information reported by Hansen, a "private citizen" informer (see, e.g., *People* v. *Guidry,* 262 Cal.App.2d 495, 497-498 [68 Cal.Rptr. 794]). The evidence obtained by the search of the trash can was highly incriminating to defendants and corroborated Hansen's report. Whether on the basis of Hansen's report alone the officers would have gone to defendants' home, conducted the lengthy stakeout, and then after observing defendant Robert Edwards move hurriedly away from them following Hern's conversation with him, made one or both of the arrests and subsequent discovery of the marijuana and L.S.D. is a matter of speculation on the present record.[5] Thus even if it be assumed that there was probable cause for the arrest of one or both of the defendants apart from the evidence found in the search of the trash can, the prosecution has failed to establish that the evidence found after the arrests was not "come at by exploitation of" the prior illegal search, and the evidence should therefore have been excluded. (See, e.g., *Somer* v. *United States,* 138 F.2d 790, 791; *United States* v. *Paroutian,* 299 F.2d 486, 488-490; *People* v. *Stoner,* 65 Cal.2d 595, 602-603, fn. 3 [55 Cal.Rptr. 897, 422 P.2d 585]; R. McGuire, *How to Unpoison the Fruit—The Fourth Amendment and the Exclusionary Rule,* 55 J. Crim. L., C. & P.S. 307, 315.)

In the absence of the improperly admitted evidence there is insufficient proof to sustain the convictions. We must therefore reverse the judgment.

It does not follow from this decision, however, that the evidence obtained after the arrests is inevitably inadmissible. Upon a retrial the prosecution may be able to establish that the evidence in question is not the "fruit" of the prior illegal search and that defendants were arrested upon probable cause apart from the evidence found in the trash can.

██ If the prosecution is successful in establishing the above matters, additional questions will arise, including, among others, whether the search that followed the arrests violated the principles set forth in *Chimel* v. *California,* 395 U.S. 752 [23 L.Ed.2d 685, 89 S.Ct. 2034]. *Chimel* declared (395 U.S. at p. 763 [23 L.Ed.2d at p. 694]) that the permissible scope under the Fourth Amendment of a search incident to an arrest is "the arrestee's person and the area 'within his immediate control'—construing that phrase to mean the

[5]The matter was not explored at the trial, undoubtedly because of the trial court's mistaken ruling that the search of the trash can was lawful.

area from within which he might gain possession of a weapon or destructible evidence. There is no comparable justification, however, for routinely searching rooms other than that in which an arrest occurs—or, for that matter, for searching through all the desk drawers or other closed or concealed areas in that room itself." *Chimel* overruled *Harris* v. *United States,* 331 U.S. 145 [91 L.Ed. 1399, 67 S.Ct. 1098], and *United States* v. *Rabinowitz,* 339 U.S. 56 [94 L.Ed. 653, 70 S.Ct. 430], each of which had upheld as incident to an arrest a search that extended beyond the scope that is permissible under *Chimel.*[6] Numerous California decisions have been in accord with *Harris* and *Rabinowitz.* (E.g., *People* v. *Chimel,* 68 Cal.2d 436 [67 Cal.Rptr. 421, 439 P.2d 333] [vac. 395 U.S. 752 [23 L.Ed.2d 685, 89 S.Ct. 2034]] ; *People* v. *Cockrell,* 63 Cal.2d 659, 667 [47 Cal.Rptr. 788, 408 P.2d 116] [cert.den. 389 U.S. 1006 [19 L.Ed.2d 604, 88 S.Ct. 568]] ; *People* v. *Rogers,* 270 Cal.App.2d 705 [75 Cal.Rptr. 919] ; *People* v. *Adame,* 250 Cal.App.2d 380, 384-385 [58 Cal.Rptr. 687] ; see *People* v. *Cruz,* 61 Cal.2d 861, 865-866 [40 CalRptr. 841, 395 P.2d 889].)

Here the Attorney General correctly concedes that the search following defendants' arrests exceeded the scope held to be permissible in *Chimel,* and the question thus arises whether *Chimel* applies to cases that are not final before the date of that decision (June 23, 1969) or only to cases in which the search took place after that date.

*Chimel* did not decide the question of retroactivity, nor did its companion cases (*Von Cleef* v. *New Jersey,* 395 U.S. 814 [23 L.Ed.2d 728, 89 S.Ct. 2051], and *Shipley* v. *California,* 395 U.S. 818 [23 L.Ed.2d 732, 89 S.Ct. 2053]). Two California cases have concluded that *Chimel* applies only to cases in which the search took place after June 23, 1969 (*People* v. *Castillo,* 274 Cal.App.2d 508 512-513 [80 Cal.Rptr. 211] ; *People* v. *Foster,* 274 Cal.App.2d 778, 780, fn. 1 [79 Cal.Rptr. 397]), and for the reasons hereafter stated we agree with that conclusion.

The criteria guiding resolution of the question of retroactivity "implicate (a) the purpose to be served by the new standards, (b) the extent of the reliance by law enforcement authorities on the old standards, and (c) the effect on

---

[6]In *Harris* the defendant was arrested in the living room of a four-room apartment, and the entire apartment was searched. In *Rabinowitz* the arrest occurred in a one-room office, and the officers searched "the desk, safe, and file cabinets in the office for about an hour and a half."

the administration of justice of a retroactive application of the new standards." (*Stovall* v. *Denno,* 388 U.S. 293, 297 [18 L.Ed.2d 1199, 1203, 87 S.Ct. 1967] ; *Johnson* v. *New Jersey,* 384 U.S. 719, 727 [16 L.Ed.2d 882, 888, 86 S.Ct. 1772] ; *Tehan* v. *Shott,* 382 U.S. 406, 413 et seq. [15 L.Ed.2d 453, 458, 86 S.Ct. 459] ; *Linkletter* v. *Walker,* 381 U.S. 618, 638 [14 L.Ed.2d 601, 613, 85 S.Ct. 1731] ; *People* v. *Feggans,* 67 Cal.2d 444, 448 [62 Cal.Rptr. 419, 432 P.2d 21] ; *In re Gaines,* 63 Cal.2d 234, 238-240 [45 Cal.Rptr. 865, 404 P.2d 473].)

 The first of the foregoing criteria strongly supports prospectivity for *Chimel.* (Cf. *Desist* v. *United States,* 394 U.S. 244, 249-250 [22 L.Ed.2d 248, 255-256, 89 S.Ct. 1030, 1048] [plurality opinion] ; *People* v. *Mabry, ante,* pp. 430, 442 [78 Cal.Rptr. 655, 455 P.2d 759] [which adopted the *Desist* rule].) The plurality opinion in *Desist,* which determined that the new rule set forth in *Katz* v. *United States,* 389 U.S. 347 [19 L.Ed.2d 576, 88 S.Ct. 507] (i.e., that every electronic surveillance upon private conversations is a search or seizure) applies only to cases in which the prosecution seeks to introduce the fruits of such surveillance conducted after the date of *Katz,* pointed out that the purpose of the rule requiring the exclusion of evidence obtained by an unlawful search or seizure is to deter illegal police action, that this purpose would not be advanced by making the new rule retrospective, that the police misconduct had already occurred and would not be corrected by releasing the prisoners involved, and that the exclusionary rule is but a procedural rule that has no bearing upon guilt or the fairness of the trial. (See also *Linkletter* v. *Walker, supra,* 381 U.S. 618, 636-638 [14 L.Ed.2d 601, 612-613, 85 S.Ct. 1731].)

*Desist* v. *United States, supra,* 394 U.S. 244, further concluded that the other two criteria (reliance of law enforcement officials on the prior rule and the burden on the administration of justice that would flow from a retroactive application) likewise militated in favor of prospective application of the new rule there involved. The same is true here.

All the reasons for making *Chimel* prospective lead to our concluding that there should be no distinction between final judgments and those not yet final and that *Chimel* is to apply only to cases in which the search was conducted after the date of that decision. As stated in the plurality opinion in *Desist* v. *United States, supra,* 394 U.S. 244, 253 [22 L.Ed.2d 248, 257, 89 S.Ct. 1030, 1048, "Both the deterrent purpose of the exclusionary rule and the reliance of law enforcement officers focus

upon the time of the search, not any subsequent point in the prosecution, as the relevant date. Exclusion of . . . evidence seized before [the decision announcing the new rule] would increase the burden on the administration of justice, would overturn convictions based on fair reliance upon [the prior] decisions, and would not serve to deter similar searches and seizures in the future.''

In arguing that *Chimel* applies to cases not final before the date of that decision, defendants cite *People* v. *De Santiago, ante,* p. 18 [76 Cal.Rptr. 809, 453 P.2d 353]. There we applied *People* v. *Gastelo,* 67 Cal.2d 586 [63 Cal.Rptr. 10, 432 P.2d 706] (which held that the mere fact that the case involved easily disposable evidence did not excuse compliance with the notice requirements of Penal Code section 1531 and which overruled cases to the contrary) in a case involving the substantially identical notice requirements of Penal Code section 844 where the officers' conduct had occurred before the decision in *Gastelo.* We held in *De Santiago* that the rule announced in *Gastelo* represented such a substantial change in the former rule as to excuse the defendant's failure to make an objection anticipating that decision. We did not, however, in *De Santiago* discuss the question of retroactivity, and *De Santiago* was decided after this court without discussion had regarded *Gastelo* as applicable to cases on appeal. (*People* v. *Rosales,* 68 Cal.2d 299, 305 [66 Cal.Rptr. 1, 437 P.2d 489].)[7] Here, however, ''the possibility of applying [*Chimel*] only prospectively is yet an open issue.'' (Cf. *Desist* v. *United States, supra,* 394 U.S. 244 [plurality opinion]; *Johnson* v. *New Jersey, supra,* 384 U.S. 719 [relating to rules in *Escobedo* v. *Illinois,* 378 U.S. 478 [12 L.Ed.2d 977, 84 S.Ct. 1758], and *Miranda* v. *Arizona,* 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602, 10 A.L.R.3d 974]].)

Defendants also cite *People* v. *Kitchens,* 46 Cal.2d 260 [294 P.2d 17], to support their claim that *Chimel* applies retroactively to cases on appeal. *Kitchens* applied the new exclusionary rule of *People* v. *Cahan,* 44 Cal.2d 434 [282 P.2d 905, 50 A.L.R.2d 513], to a case tried before *Cahan. Kitchens,* however, did not discuss the question of retroactivity and in our more recent cases under appropriate circumstances we have selected the date of the prohibited practice (*People* v. *Mabry, supra, ante,* pp. 430, 442 [rule in *Katz* v. *United*

---

[7] The date of the officers' conduct in *Rosales* appears in the Court of Appeal decision in that case. (*People* v. *Rosales* (Cal.App.) 61 Cal.Rptr. 170.)

*States, supra,* 389 U.S. 347]; *People* v. *Feggans, supra,* 67 Cal.2d 444, 448 [rule in *United States* v. *Wade,* 388 U.S. 218 [18 L.Ed.2d 1149, 87 S.Ct. 1926], and *Gilbert* v. *California,* 388 U.S. 263 [18 L.Ed.2d 1178, 87 S.Ct. 1951]]); or the date the trial was commenced (*People* v. *Rollins,* 65 Cal.2d 681 [56 Cal.Rptr. 293, 423 P.2d 221] [rule in *Miranda* v. *Arizona, supra,* 384 U.S. 436]) to determine the applicability of a new rule. Defendants also point to decisions in which this court has applied the new rule there involved to cases that were not final before the decision announcing that rule (*People* v. *Rollins, supra* [rule in *Escobedo* v. *Illinois, supra,* 378 U.S. 478]; *People* v. *Charles,* 66 Cal.2d 330 [57 Cal.Rptr. 745, 425 P.2d 545] [rule in *People* v. *Aranda,* 63 Cal.2d 518 [47 Cal.Rptr. 353, 407 P.2d 265]]), but "Each . . . rule of criminal procedure has its own distinct functions, its own background of precedent, and its own impact on the administration of justice, and the way in which these factors combine must inevitably vary with the dictate involved." (*Johnson* v. *New Jersey, supra,* 384 U.S. 719, 728 [16 L.Ed.2d 882, 889, 86 S.Ct. 1772].)

An additional question that may arise upon retrial is whether, as argued by defendants on appeal, the arrests were a pretext for the subsequent search.[8] Defendants rely upon the settled rule that when it appears that the search and not the arrest was the real object of the officers in entering upon the premises and that the arrest was a pretext for or at most an incident of the search, the search is not reasonable within the meaning of the Constitution. (See *People* v. *Haven,* 59 Cal.2d 713, 719 [31 Cal.Rptr. 47, 381 P.2d 927].) The recited facts, however, do not show that this is such a case.

The judgment is reversed.

Traynor, C. J., McComb, J., Tobriner, J., Mosk, J., and Sullivan, J., concurred.

PETERS, J.—I concur in the portion of the majority decision holding that the search of the trash can was unlawful. I dissent, however, from the portion of the majority opinion that holds that the rule of *Chimel* v. *California,* 395 U.S. 752 [23 L.Ed.2d 685, 89 S.Ct. 2034] and the companion cases of *Von Cleef* v. *New Jersey,* 395 U.S. 814 [23 L.Ed.2d 728, 89 S.Ct. 2051], and *Shipley* v. *California,* 395 U.S. 818 [23

---

[8]Another question is the effect, if any, upon the legality of the arrests of the previously recited statement by Hern as to the cause of the arrests. This question has not been argued on appeal.

L.Ed.2d 732, 89 S.Ct. 2053], applies only to searches which occurred subsequent to June 23, 1969, the date of those decisions.

In my view the rule announced in *Chimel* applies to all pending cases. To hold that its rulings are purely prospective is an arrogant abuse of judicial power and a blatant exercise of legislative power. In prior opinions, I have stated in detail why this practice of rendering decisions purely prospective is contrary to the judicial function (e.g., *People* v. *Feggans,* 67 Cal.2d 444, 449 et seq. [62 Cal.Rptr. 419, 432 P.2d 21]; *People* v. *Rivers,* 66 Cal.2d 1000, 1005 et seq. [59 Cal.Rptr. 851, 429 P.2d 171]; *People* v. *Rollins,* 65 Cal.2d 681, 693 et seq. [56 Cal.Rptr. 293, 423 P.2d 221]), and I will not further repeat those general views herein, but will instead set forth the specific reasons why the fair and effective administration of justice requires that the rules adopted in *Chimel* be applied to pending cases. In doing so, I shall accept the three criteria urged by the majority, the purpose of *Chimel,* the burden on the administration of justice, and reliance by law enforcement officials.

In urging that the purposes of *Chimel* will be served by purely prospective application, the majority totally ignore the considerations which led this court and the United States Supreme Court to adopt the rule excluding evidence obtained in violation of the Fourth Amendment's proscription against unreasonable searches and seizures. *Chimel* is part of that rule, and when those considerations are examined, it becomes apparent that the fair and effective administration of justice will not be served by the majority's decision today but to the contrary will be greatly harmed. The majority's arguments, to the extent that they are entitled to any weight, constitute a direct attack on the exclusionary rule itself rather than furnishing a basis to refuse to apply *Chimel* to pending cases.

In *People* v. *Cahan,* 44 Cal.2d 434, 445 [282 P.2d 905, 50 A.L.R.2d 513], this court repudiated the old rule that evidence obtained by searches and seizures in violation of the Fourth Amendment was admissible on the ground that "other remedies have completely failed to secure compliance with the constitutional provisions on the part of police officers with the attendant result that the courts under the old rule have been constantly required to participate in, and in effect condone, the lawless activities of law enforcement officers." We went on to amplify upon the two policies pointing out that out "of

regard for its own dignity as an agency of justice and custodian of liberty the court should not have a hand in such 'dirty business' " as the securing of convictions by unlawful searches and seizures, that the end that the state seeks in such searches and seizures, although laudable, no more justifies unlawful acts than a laudable end justifies unlawful action by any member of the public, that it is "morally incongruous for the state to flout constitutional rights and at the same time demand that its citizens observe the law," that "any process of law that sanctions the imposition of penalties upon an individual through the use of the fruits of official lawlessness tends to the destruction of the whole system of restraints on the exercise of the public force that are inherent in the 'concept of ordered liberty,' " that experience has demonstrated that neither administrative, civil, or criminal remedies are effective in suppressing lawless searches and seizures, that appellate cases represent "only a small fraction of the violations of the constitutional provisions that have actually occurred," and that the constitutional provisions contemplate that it is preferable that some criminals go free than that the right of privacy of all the people be set at naught. (44 Cal.2d at pp. 445-449.) Similar views are expressed in *Mapp* v. *Ohio*, 367 U.S. 643 [6 L.Ed.2d 1081, 81 S.Ct. 1684, 84 A.L.R.2d 933].

Both of the fundamental policies reflected by *Cahan* and *Mapp* are frustrated by the rule of prospective application adopted by the majority. The immediate result of the refusal to apply *Chimel* to pending cases means that the appellate and trial courts of this state will have a hand in the "dirty business" of securing convictions by the use of unlawfully obtained evidence. In these days, when so many people have taken to the streets in attack upon our institutions and in defiance of the fundamental concepts of ordered liberty, it is more than ever necessary that a court out of regard for its own dignity as an agency of justice and custodian of liberty strive to maintain that dignity, vindicate constitutional rights, and encourage respect for a system of justice which does not sacrifice constitutional rights for expediency. Yet we are told today that a trial court may convict Mr. Edwards and others on the basis of evidence seized in violation of constitutional rights and, if so, appellate courts may affirm that conviction. Such a decision lends no dignity to our court system and does not encourage respect for our institutions or our law.

Today's decision of the majority not only means that trial and appellate courts of this state will knowingly and intentionally have a hand in the "dirty business" of securing convictions on the basis of evidence secured by law enforcement officials in violation of our constitutional guarantees but also frustrates to a substantial extent the second purpose of the exclusionary rule, to discourage unlawful searches and seizures by police officers in the only effective way, removing the profits of such conduct. Of course, the unlawful search and seizure which has already occurred may not be undone. The thrust of the exclusionary rule is to deter unlawful searches and seizures in the future and to encourage police officers to secure evidence by legal rather than illegal means. (*People* v. *Cahan, supra,* 44 Cal.2d at p. 448.) The constitutional provision against unlawful searches is concerned with all searches both those which turn up evidence or contraband and those which involve a substantial and unconstitutional invasion of the right of privacy fail to turn up any evidence or contraband.

The accomplishment of these objectives, the encouragement of police officers to secure evidence by legal rather than illegal means and the deterrence of unlawful searches whether or not they turn up evidence or contraband, requires that the rules regarding the permissible scope of searches be made certain and that they be made certain without unnecessary delays.

To have adopted the exclusionary rule in *People* v. *Cahan, supra,* which only in the broadest terms set forth the permissible scope of lawful searches, and then to have refused to determine expeditiously which searches are lawful and which are unlawful would have frustrated one or the other, or possibly both, of these objectives because police officers, when confronted with an opportunity to search for evidence, would often be uncertain as to whether they could lawfully obtain the evidence. Similarly, to refuse to expeditiously determine which searches are lawful and unlawful under *Chimel* will also frustrate to a substantial extent either the objective of encouraging officers to secure evidence by lawful rather than unlawful means or the objective of deterring unlawful searches, or both, because the applicability of *Chimel* in a variety of the most common situations is unclear.

The uncertainty of the applicability of *Chimel* to common situations is apparent. *Chimel* declared that the permissible scope under the Fourth Amendment of a search incident to an

arrest is "the arrestee's person and the area 'within his immediate control'—construing that phrase to mean the area from within which he might gain possession of a weapon or destructible evidence. There is no comparable justification, however, for routinely searching rooms other than that in which an arrest occurs—or, for that matter, for searching through all the desk drawers or other closed or concealed areas in that room itself." (23 L.Ed.2d at p. 694.) Numerous questions arise under *Chimel*. When a police officer arrests a motorist who has stepped out of his automobile, he is immediately confronted with the broad legal question whether *Chimel* applies to arrests of motorists or is limited to arrests of persons in homes as was involved in *Chimel*, and the practical question whether he may search the car or any part of it. When a police officer arrests a pedestrian carrying a wrapped package or a locked suitcase, the officer must determine whether *Chimel* applies to searches of pedestrians incident to an arrest and whether he may inspect the package or the suitcase. Even as to arrests occurring in homes, questions will arise as to what is meant by the phrase "the area 'within his immediate control.'" Of course, numerous further questions could be listed, but the point is clear.

The objectives of encouraging police officers to obtain evidence by lawful rather than unlawful means and of deterring unlawful searches requires that the appellate courts of this state deal with these problems promptly in the ordinary course of judicial review and that we do not delay consideration, as the majority does, for several years while cases involving searches occurring after June 23, 1969, work their way through our judicial system.[1] Such delays will mean that many police officers on the basis of an overly restrictive view of *Chimel* will engage in unlawful searches and that others in a conscientious effort to protect constitutional rights will forego opportunities to obtain evidence and contraband in situations where a search would not be unlawful. It is no answer to suggest that when in doubt an officer may seek a search warrant because it is not clear that officers will do so or that a search warrant is available in all situations where a search incident to arrest is permissible under *Chimel*.

---

[1]It is true that the United States Supreme Court and this court have held that the question of unlawful search and seizure may not be raised on habeas corpus after conviction. (*Linkletter* v. *Walker*, 381 U.S. 618 [14 L.Ed.2d 601, 85 S.Ct. 1731]; *In re Lessard*, 62 Cal.2d 497 [42 Cal. Rptr. 583, 399 P.2d 39].) However, refusal to permit the question to be raised on collateral attack does not frustrate the purpose of deterrence so long as the question can be raised in pending cases.

It thus is clear to me that the purposes of the exclusionary rule will be advanced by applying *Chimel* to pending appeals and that the majority in asserting the contrary is simply ignoring the purposes of the exclusionary rule. In this connection, the majority asserts that the police misconduct has already occurred and would not be corrected by releasing the prisoners involved and that "the exclusionary rule is but a procedural rule that has no bearing upon guilt or the fairness of the trial." These matters, however, are true in every case where the exclusionary rule requires the release of a prisoner, and the argument goes, not to the issue of pure prospective application, but to the wisdom of the exclusionary rule itself. This court rejected such arguments in *People* v. *Cahan, supra*, 44 Cal.2d 434, 442-445, and aging has not given them any merit.

The other two criteria relied upon by the majority, burden on the administration of justice and reliance of law enforcement officials, do not warrant repudiation of the policies underlying the exclusionary rule and of the well settled principle that judicial decisions unlike legislative acts would be applied to pending appeals. There is no doubt that application of *Chimel* will involve substantial burdens on trial and appellate courts, but much of this burden must be faced sooner or later by our courts when they are called upon to determine the applicability of *Chimel* to numerous situations. In any event, when the relatively few pending cases are weighed against the numerous searches which officers will conduct during the period when the courts of this state refuse to consider the rules established by *Chimel*, it is apparent that the pending cases are merely the tip of the iceberg and furnish no justification to ignore its base. The business of and sole justification for the courts is declaring the law and determining controversies, and the possibility that the load of the courts will be lightened does not warrant a refusal to declare or protect constitutional rights. Such rights rest on no such uncertain ground.

With regard to reliance of law enforcement officials, it must be first pointed out that the majority opinion itself shows that this is a slender reed upon which to premise a refusal to apply rules to pending appeals. The majority in holding that on the record before us the trash can search was unlawful disapprove *People* v. *Bly*, 191 Cal.App.2d 352, 354 [12 Cal.Rptr. 542], without regard to whether the officers in the instant case might have relied upon *Bly* in making their search. It has

never been held that the fact that an officer believes he acted lawfully renders the exclusionary rule inapplicable, and this court should not so hold now.

Secondly, both the majority and the dissent in *Chimel* recognize that the United States Supreme Court had taken vacillating and somewhat inconsistent positions as to the permissible scope of a search incident to an arrest. (395 U.S. at pp. 755-761, 765, 770-772 [23 L.Ed.2d at pp. 689-692, 695, 698-699, 89 S.Ct. at pp. 2036-2039, 2041, 2044-2045].) As the majority there pointed out, a search of an entire home as incident to an arrest therein is not "supported by a reasoned view of the background and purpose of the Fourth Amendment" and that it would be "possible" to distinguish such a search from prior cases decided by the court.

Similarly, the cases of the appellate courts of this state had not laid down a hard and fast rule with respect to the permissible scope of a search incident to an arrest. Thus, in *People* v. *Cruz*, 61 Cal.2d 861, 866 [40 Cal.Rptr. 841, 395 P.2d 889], we stated the rule that "a search is not 'incidental to an arrest' unless it is limited to the premises where the arrest is made; is contemporaneous therewith; has a definite object; and is reasonable in scope." In *Cruz*, we held invalid a search which occured in a house a few feet from the place of arrest, and we pointed out that although the rule might appear arbitrary in some situations we were constrained to adopt it and clarify it for those who must work under it in the field. In accordance with the *Cruz* rule as to definite object, cases of this state have limited the right to search incident to arrest and held unlawful exploratory searches which occur following the arrest. (*People* v. *Baca*, 254 Cal.App.2d 428, 430-431 [62 Cal.Rptr. 182] ; *People* v. *Mills*, 148 Cal.App. 2d 392, 398 [306 P.2d 1005] ; see *People* v. *Vasquez*, 256 Cal. App.2d 342, 346 [63 Cal.Rptr. 885].)

On the other hand, as the majority point out, there are cases by the courts of this state which greatly expanded the right to search incident to arrest. Courts in this state have also seemed to expand the test enunciated in *Cruz*. Thus *People* v. *Davis*, 231 Cal.App.2d 180, 184-185 [41 Cal.Rptr. 617], and *People* v. *Aleria*, 193 Cal.App.2d 352, 357-358 [14 Cal. Rptr. 162], seem to extend the strict rule of *Cruz* as to premises where the arrest occurred. The requirement of *Cruz* of a definite object has been diluted to the extent that it is satisfied by a general purpose on the part of the arresting officers to find contraband or fruits or instrumentalities of the crime.

(Cf. *People* v.. *Cockrell,* 63 Cal.2d 659, 667 [47 Cal.Rptr. 788, 408 P.2d 116]; *People* v. *Rogers,* 270 Cal.App.2d 705, 709-711 [75 Cal.Rptr. 919].) In other words, general exploratory searches incident to an arrest seem to be permitted under some authorities.

Although cases of the United States Supreme Court and of the courts of this state had recognized a right to search premises incident to an arrest and limitations on the right, those rules were by no means well established or entirely consistent. As recognized by *Chimel* and by *United States* v. *Rabinowitz,* 339 U.S. 56, 63, 66 [94 L.Ed. 653, 658, 660, 70 S.Ct. 430], the main case overruled by *Chimel,* the reasonableness of searches depends upon the facts and circumstances, and the courts have not been consistent in determining what principles are to be applied in determining reasonableness. *Chimel* establishes that reasonableness is to be determined by viewing the facts and circumstances in the light of established Fourth Amendment principles. Certainly this is not new law. We have applied the rule that reasonableness must be determined in the light of Fourth Amendment principles as early as *People* v. *Brown,* 45 Cal.2d 640, 644 [290 P.2d 528], and *People* v. *Simon,* 45 Cal.2d 645, 648 [290 P.2d 531]. In this sense *Chimel* is not new law but merely determines within the rule recognized in *People* v. *Cruz, supra,* 61 Cal.2d 861, 866, what searches are "reasonable in scope." When we decided what searches were on the premises, reliance on preexisting law or the absence of cases considering the question was not deemed grounds to refuse to apply the new rules to pending cases. Likewise, such reliance has not prevented application of the definite object rule to pending cases. I see no reason why reliance on preexisting cases should preclude application of the *Chimel* rule determining the scope of searches incident to an arrest.

Moreover, even assuming that on the basis of reliance we should hold that *Chimel* is not applicable to some pending cases, it certainly should be applied to cases, such as the present one, where there was a conflict in the authorities as to whether the search was lawful and where there is no reason to believe that the prosecution was prejudiced because it was unaware of the *Chimel* rule. As noted above, in *Cruz* this court required a definite object of a search incident to an arrest although we did not spell out what was meant by this requirement. A similar requirement is recognized by the dissenting opinion in *Chimel,* where Justice White states that to

go beyond a search of the arrested man and of the items within his immediate reach, there must be "probable cause to believe that seizable items are on the premises." (395 U.S. at p. 773 [23 L.Ed.2d at p. 700, 89 S.Ct. at p. 2046].)

In the instant case prior to the arrest of defendant and the search of his house, the officers had seized from the trash can all of the contraband they had reason to believe was possessed by defendant. They had no information indicating that defendant had additional marijuana or drugs or that evidence might be found by a search. None of the cases cited by the majority nor any that I am aware of have permitted a search of a home, literally from top to bottom, in the circumstances presented here, and there is no basis for the officers involved in the search to claim that they were relying on judicial decisions authorizing such a search.

Nor do I find any prejudice to the prosecution by application of the *Chimel* rule in the instant case. This is not a case where had the officers been aware of the *Chimel* rule they might have obtained a search warrant and seized the contraband found in the search after the arrest. Probable cause is an essential requirement for a search warrant (see Witkin, Cal. Evidence (2d ed. 1966) p. 124), and the officers did not have probable cause to believe that there was contraband in the house. With respect to the narcotics found in his home, this appears to be one of those cases referred to in *People* v. *Cahan, supra,* 44 Cal.2d 434, 449, where had "the Constitution been obeyed, the criminal could in no event be convicted."[2] The prosecution should not be placed in a better position than had it been aware at all times of the *Chimel* rules.

I agree with the view expressed by Justice Harlan, the only member of the United States Supreme Court who has taken a position on the issue, that *Chimel* should apply to pending appeals. (See concurring opinion, *Von Cleef* v. *New Jersey, supra,* 395 U.S. 814, 817 [23 L.Ed.2d 728, 731, 89 S.Ct. 2051, 2053].)

On October 23, 1969, the opinion was modified to read as printed above.

---

[2]As was also pointed out in *Cahan,* our Constitution contemplates that it is preferable that some criminals go free than that the right of privacy of all citizens be set at naught. (44 Cal.2d at p. 449.)